# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0969
Filed July 22, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,

v.

**Joseph Maurice Horner,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Kristen Formanek, Judge.

———————————

**AFFIRMED**

———————————

Erin Carr of Carr Law Firm, P.L.C., Des Moines, attorney for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant
Attorney General, attorneys for appellee.

———————————

Considered without oral argument
by Schumacher, P.J., and Ahlers and Badding, JJ.
Opinion by Badding, J.

1

**BADDING, Judge.**

While out on routine patrol, Officer Rogelio Apolonio pulled Joseph Horner over for a broken brake light. As the officer was in his cruiser writing Horner a citation, the passenger in the vehicle took off running. Officer Apolonio handcuffed Horner and searched the vehicle. He found a bag of methamphetamine inside a box of Montego cigarettes in the driver's side door.

Horner was charged with possession of methamphetamine. He moved to suppress the evidence seized during the stop, arguing that the officer impermissibly extended the stop after the passenger's flight. The district court denied Horner's motion, finding that when the passenger ran from the vehicle, the officer could not "be expected to simply shrug his shoulders and wave goodbye to the defendant." Horner challenges this ruling on appeal from his conviction for the drug charge.

## I.    Background Facts and Proceedings

Just before midnight on January 16, 2025, Des Moines Police Officer Rogelio Apolonio was patrolling the area of Hubbell and Easton in Des Moines when he saw a grey Toyota Corolla with a broken brake light. The officer initiated a traffic stop and encountered the driver—Joseph Horner— and a passenger. As Officer Apolonio walked up to the car, he heard "a loud crashing sound, almost as if something was being smashed." The officer shined his flashlight around the car and asked its occupants if they had dropped something. Horner denied knowing what had made the noise.

Officer Apolonio said, "okay," and turned to the traffic violation. He asked for Horner's identification, told him the reason for the stop, and asked where Horner and his passenger were coming from. Horner, who was

smoking a cigarette, responded, "I was just grabbing cigarettes up there at that gas station. The Montegos are cheaper, but the crowd's a little rougher." Officer Apolonio was familiar with two gas stations in the area, both of which were known for "high narcotic usage."

After that exchange, Officer Apolonio turned his attention to the passenger, asking him: "Do you have your ID on you, brother? Please and thank you." The passenger said no, so the officer asked for his last name. Hesitating, the passenger asked the officer why he wanted it. Officer Apolonio pressed for a name, telling the passenger, "I don't plan on jamming you up, but if you have something to take care of, let's take care of it." The passenger eventually complied, and the officer went back to his cruiser to check for warrants and issue a warning for the brake light.

Officer Apolonio immediately began working on his computer once he was back in his cruiser. But just over a minute later, the passenger darted out of the car and ran away. The officer called for backup to pursue the passenger and asked Horner why the passenger ran. Horner said that he didn't know, later claiming that he had just met the passenger at the gas station. Officer Apolonio asked Horner to step out of the car and handcuffed him for "my safety and yours." He told Horner, "I was right in the middle of writing a fricking warning, man." The officer hadn't found any outstanding warrants for the passenger and had "absolutely no idea" why he ran.

The officer sat Horner on the front of his cruiser and returned to his computer. After another minute or two, Officer Apolonio asked Horner if he could "search him real quick." Horner agreed. The officer then asked for consent to search the vehicle. Horner again agreed. Inside the driver's side door handle, he found a box of Montego cigarettes. And inside that box, he found a bag of methamphetamine.

Horner was charged with possession of methamphetamine. He moved to suppress the evidence seized during the stop, arguing that Officer Apolonio unlawfully extended the scope and duration of the stop without reasonable suspicion particularized to Horner. The district court denied the motion. Based on the circumstances of the stop and the passenger's flight, the court found the officer had reasonable suspicion to conduct further investigation.

After the district court denied the motion to suppress, Horner entered a conditional guilty plea that preserved his right to appeal the suppression ruling. *See* Iowa Code § 814.6(3) (2025). We find adjudication of the preserved issue is "in the interest of justice," *id.*, as success "would give [Horner] some relief," *State v. Scullark*, 23 N.W.3d 49, 53 (Iowa 2025).

## II.    Standard of Review

"The standard of review for a constitutional search and seizure challenge is de novo." *State v. McClain*, 20 N.W.3d 488, 494 (Iowa 2025) (citation omitted). We make an "independent evaluation of the totality of the circumstances" as shown by the entire record. *Id.* (citation omitted). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of the witnesses, but we are not bound by those findings." *Id.* (citation omitted).

## III.    Analysis

Both the Fourth Amendment of the United States Constitution and article 1, section 8 of the Iowa Constitution prohibit unreasonable searches and seizures by the government.[1] "The detention of an individual during a

---

[1] Because Horner does not advocate for different interpretations under the federal and state constitutions, we will apply the same analysis. *See State v. Tyler*, 830 N.W.2d 288,

traffic stop, even if brief and for a limited purpose, is a seizure within the meaning of the Fourth Amendment." *State v. Salcedo*, 935 N.W.2d 572, 577 (Iowa 2019) (citation omitted). Observing a traffic violation of any degree gives officers probable cause to stop a driver, which makes the stop a reasonable seizure. *Id.* Horner does not contest the validity of the initial traffic stop. Instead, he claims the seizure violated his constitutional rights when Officer Apolonio improperly prolonged the scope and duration of the traffic stop.

"Once lawfully stopped, inquiries reasonably related to the mission of addressing the traffic infraction and attending to related safety concerns are permissible." *Id.* at 578 (cleaned up). "A reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." *Id.* (cleaned up); *accord State v. Warren*, 955 N.W.2d 848, 865 (Iowa 2021) ("As we have held time and again, when there is a valid ongoing traffic stop, officers may properly seek driver's identification, registration, and insurance information." (cleaned up)). In the end, however, "the mission of the stop is to address the traffic infraction," and the stop "may last no longer than is necessary to effectuate that purpose." *Salcedo*, 935 N.W.2d at 578 (cleaned up).

Under these principles, Horner first argues that Officer Apolonio "prolong[ed] the stop to investigate the passenger's identity—a task completely unrelated to the initial purpose of the stop." But officers are

---

291–92 (Iowa 2013) ("Where a party raises both state and federal constitutional claims but does not argue that a standard independent of the federal approach should be employed under the state constitution, we ordinarily apply the substantive federal standards but reserve the right to apply the standard in a fashion different from federal precedent.").

allowed to talk with passengers and ask them for their identification. *See State v. Smith*, 683 N.W.2d 542, 545 (Iowa 2004) (rejecting the defendant's argument that because he was a passenger, the deputy was required to have reasonable suspicion that he was engaged in criminal activity before requesting identification); *see also State v. Riley*, 501 N.W.2d 487, 489 (Iowa 1993) (holding that "merely talking to a passenger or asking for identification . . . is well within the officer's right and is not illegal"). "In fact, an officer may detain the occupants of a vehicle during a traffic stop while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *Salcedo*, 935 N.W.2d at 580 (cleaned up). Those routine tasks include running a computerized check of the vehicle's registration and insurance; running a similar check of a passenger's identification; preparing the traffic citation or warning; and asking "the occupants about their destination, route, and purpose." *Id.* (cleaned up). That is exactly what Officer Apolonio did here. And those actions did not impermissibly extend the stop beyond its mission to address the broken brake light.

Horner next argues that once the passenger ran away, Officer Apolonio "should have completed [Horner's] citation and sent him on his way. Instead, he prolonged the encounter, exceeding the scope of the stop, by handcuffing [Horner], who had been entirely cooperative throughout the entire interaction." An officer's investigation into a traffic violation "may be expanded to satisfy suspicions of criminal activity unrelated to the traffic infraction based upon responses to reasonable inquiries." *Id.* at 578. "But the officer must identify specific and articulable facts which, taken together with rational inferences from those facts, amount to reasonable suspicion that further investigation is warranted." *Id.* (cleaned up). Whether reasonable

suspicion for further investigation exists is determined by the totality of the circumstances presented to the officer. *Id.*

Turning to those circumstances, we find that after the passenger fled, Officer Apolonio had reasonable suspicion of other criminal activity warranting further investigation. It was just before midnight when the officer pulled over the vehicle. *See State v. Kreps*, 650 N.W.2d 636, 646 (Iowa 2002) (finding time of day is a relevant factor in determining whether there are grounds for an investigatory stop). As he approached the car, the officer heard an unexplained loud crash. Once at the car, Officer Apolonio learned that Horner had just bought cigarettes at a nearby gas station with a "rough crowd." And Officer Apolonio knew there were two in the area that were frequented by methamphetamine users. *See State v. Corbett*, 758 N.W.2d 237, 240 (Iowa Ct. App. 2008) (finding that officers may use their own experience and training to make inferences from the information available to them).

These facts, when combined with the passenger's flight, gave Officer Apolonio reasonable suspicion that further investigation was warranted. *See Kreps*, 650 N.W.2d at 645 (noting that "headlong flight—whenever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such" (cleaned up)). While Horner argues that he "had no control over the passenger's actions"—which he says could have been "just as attributable to Officer Apolonio's unwarranted interrogation as to any association [the passenger] might have had with" Horner—"[o]ccupants of a car differ from, for example customers in a store or passengers on a public bus." *Id.* at 647 (citation omitted). Those inside a vehicle

> are traveling together by choice and thus may be assumed to have some personal or business association with one another. Knowledge or suspicion that one of the occupants has been involved in criminal activity occurring

7

within the car, or involving the car itself, serves as a basis for a reasonable suspicion that the other occupants may be participants in that activity.

*Id.* (cleaned up).

Under these circumstances, we agree with the district court and find that after the passenger fled, Officer Apolonio was not required "to merely 'shrug his shoulders' and let criminal conduct occur or a criminal to escape. He was allowed to take the intermediate course—stop, investigate, and resolve the ambiguity." *Id.* at 648. We accordingly affirm the court's denial of Horner's motion to suppress and his subsequent conviction.

**AFFIRMED.**